## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:20-CR-243** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **KEVIN ALYN MADZIAREK,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Defendant Kevin Alyn Madziarek moves to suppress evidence obtained during a search of his campsite located on a friend's property. For the following reasons, we will deny Madziarek's motion.

I.   **Findings of Fact**[1]

At roughly 4:30 p.m. on August 10, 2020, Pennsylvania State Police Troopers Scott Dojka and Tyler Watkins were dispatched to the Bonnie Brook Riding Club (the "Riding Club") located at 533 Mountain Road, South Middleton Township, Pennsylvania, to investigate complaints of shots fired and possible trespassing. (11/13/20 Tr. 6:14-7:1, 74:1-4). Upon arrival, the troopers met the complainants at a driveway leading from Mountain Road to the Riding Club. The driveway divides a lot on the left—the "Terry property"—from the Riding Club on the right. (Id. at 7:5-9). An aerial photograph of the subject properties is below:

---

[1] The following factual narrative derives from testimonial and documentary evidence adduced during the suppression hearing in this matter, together with the parties' briefing. Citations to hearing exhibits are abbreviated as "Gov't Ex." or "Def. Ex." Citations to the November 13, 2020 suppression hearing transcript are abbreviated as "11/13/20 Tr. __." This recitation of facts reflects the court's credibility determinations. To be clear, we find the testimony of Trooper Dojka to be very credible.



(Def. Ex. 120). The lot marked "46" is the Terry property, and the lot marked "45" is the Riding Club. (See Def. Exs. 120, 121, 122). The complainants advised the troopers that they heard gunfire from campers on the Terry property between 8:00 p.m. and 10:00 p.m. the night before. (Id. at 7:16-22). That property is owned by Jonothan and Cherrie Terry. (Id. at 78:10-11, 92:13-16; Def. Ex. 121).

Shortly after arriving, Trooper Dojka observed Bradley Moyer and A.M.— Kevin Madziarek's brother and son, respectively—walking through the woods to the left of the Riding Club.[2] (11/13/20 Tr. 7:24-8:16). Trooper Dojka testified that, upon noticing the troopers, Moyer "let out a loud bird-like call." (Id. at 8:24-25). When the troopers approached, Moyer informed Trooper Dojka that he was there to pick up Madziarek and A.M., who were camping on the Terry property and setting off fireworks the night before. (Id. at 10:11-17). Moyer related that he had been at

---

[2] Pursuant to Local Rule 5.2(d), we refer to Madziarek's minor son by his initials. See M.D. PA. L.R. 5.2(d).

the campsite with Madziarek and A.M. while they were setting off fireworks, but that he left and did not spend the night so that the pair could "have father/son time." (Id. at 10:10-17, 48:17-22).  Moyer told Trooper Dojka that the group had not been using firearms and that they had permission to be on the property. (Id. at 10:23-11:1).  Moyer did not know the name of the individual who gave them permission to camp, and stated that Madziarek had that information. (Id. at 11:1-9).  Trooper Dojka inquired as to Madziarek's whereabouts, and Moyer replied that he "was likely back at the campsite packing up." (Id. at 11:10-15).  Trooper Dojka asked Moyer if he would lead him to the campsite to try to find Madziarek, and Moyer agreed to do so. (Id. at 11:17-23, 66:16-21).

Moyer led Trooper Dojka through the woods back to the campsite, which Trooper Dojka estimated was roughly 125 yards from Mountain Road. (Id. at 12:16-24).  When the two were about 100 feet away from the campsite, Trooper Dojka witnessed Moyer let out another shrill, birdcall signal. (Id. at 12:25-11).  At the campsite, Trooper Dojka observed a tent, a campfire that appeared to still be smoldering, and camping gear outside of the tent. (Id. at 13:14-18).  He also noticed a "lit-up clear box with a switch on it," (id. at 13:19-21), located 30 to 50 feet away from the tent, (id. at 14:25-15:7).  The box was further from the tent than the fire pit. (Id.)  Trooper Dojka testified that the electrical box caught his attention and appeared suspicious. (Id. at 13:19-21, 59:10-12).  Moyer explained to Trooper Dojka that the box was Madziarek's and that it was sound equipment. (Id. at 16:5-8).

Trooper Dojka also testified that the front of the tent was open and that, without entering the tent, he could see bags and other items inside. (Id. at 15:25-

16:4, 61:20-62:6). He explained that he did not see any buildings or permanent structures on the property, and that the campsite was likely 60 to 75 yards from the Riding Club. (Id. at 16:19-17:20). All told, Trooper Dojka and Moyer were at the campsite for roughly three minutes before they returned to Mountain Road. (Id. at 17:21-18:5). Trooper Dojka left the campsite area so quickly because he was "uncomfortable being there on [his] own based upon the circumstances," particularly in light of Madziarek's unknown whereabouts and Moyer's unusual birdcall signals. (Id. at 17:23-24; see also id. at 16:11-17).

After returning to the road, Moyer attempted to reach Madziarek via a messaging application on his phone to ask where he was and who had given them permission to be on the property. (Id. at 18:7-18). Madziarek did not provide his location but he informed Moyer that Rebekah Terry had granted them permission. (Id. at 18:15-25). The troopers then ran a records search for Madziarek, A.M., and Moyer, and learned that Madziarek had an active warrant for retail theft and that he was a felon not to possess. (Id. at 19:18-20:3). During the records review, a passerby confirmed that the Terry family would have given the campers permission. (Id. at 20:7-13). The troopers spoke to Rebekah Terry, and she confirmed that the Terry family gave the group permission to camp on the land. (Id. at 20:13-15, 94:9-16). The troopers advised Moyer and A.M. that they were free to leave, which they did. (Id. at 20:17-21:2).

In light of Madziarek's active warrant, Troopers Dojka and Watkins returned to the campsite to look for him. (Id. at 21:12-21, 55:4-7). They did not find Madziarek. However, shortly after their arrival, and much to their surprise, Moyer

returned to the campsite.  (Id. at 21:22-22:7).  The troopers immediately asked Moyer if he knew Madziarek's whereabouts, and informed Moyer that Madziarek had an outstanding warrant.  (Id. at 22:22-24).  Moyer responded: "[I]f he has a warrant, then he's not going to be out here, he's going to be long gone."  (Id. at 22:24-23:1).  The troopers asked Moyer who owned the items at the campsite, and Moyer replied that all personal property at the campsite belonged to Madziarek.  (Id. at 23:1-7).  Then, Moyer promptly turned around and left the campsite, heading back to the main road—the direction from which he came.  (Id. at 23:12-20).  He departed without taking anything from the campsite.  (Id.)

Troopers Dojka and Watkins more closely inspected the lit-up box.  They observed "two cylindrical devices" near the device and suspected that they were likely improvised explosive devices ("IEDs").  (Id. at 23:21-15; Gov't Ex. 5).  The lit-up box and both the cylindrical devices were observed in plain view.  (11/13/20 Tr. 24:20-23).  At that point, Trooper Dojka reached out to his patrol supervisor, who contacted the hazardous device unit.  (Id. at 24:24-25-6).  The hazardous device unit and a Federal Bureau of Investigation bomb tech arrived between one-and-a-half and two hours later, confirmed that the two devices were explosives, and seized them in an effort to render them safe.  (Id. at 25:7-16, 26:8-15).

Trooper Dojka applied for and obtained a search warrant for the property surrounding the campsite, the objects therein, and any items in the tent that may be contraband.  (Id. at 26:16-27:8, 64:21-25; see also Gov't Ex. 20).  The search warrant was executed shortly afterward.  (11/13/20 Tr. 27:12-19).  The troopers had not entered the tent at any point prior to executing the search warrant.  (Id. at 27:20-22).

II.   **Procedural History**

A grand jury indicted Madziarek on one count of unlawful possession of a destructive device, in violation of 26 U.S.C. § 5861(d).  Madziarek filed a motion to suppress, to which the government responded.  We held a suppression hearing on November 13, 2020.  The parties submitted supplemental briefing and the motion is ripe for disposition.

III.   **Discussion**

Madziarek argues that all evidence obtained from the campsite and inside his tent should be suppressed on the theory that search of the site violated his property rights and his reasonable expectation of privacy.  (Doc. 20 at 4; Doc. 33 at 8, 12).  The government rejoins that Madziarek has no Fourth Amendment interest in the campsite because it was in an "open field," which carries no Fourth Amendment protection.  (Doc. 23 at 3-7; Doc. 34 at 2-5).  Alternatively, the government argues that the searches and seizures are permissible under the consent, abandonment, plain-view, and good-faith doctrines.  (Doc. 34 at 5-9).

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  Warrantless searches of these areas are *per se* unreasonable, with a few exceptions.  United States v. Harrison, 689 F.3d 301, 306 (3d Cir. 2012) (quoting California v. Acevedo, 500 U.S. 565, 580 (1991)).  A Fourth Amendment search occurs when the government violates a person's "reasonable expectation of privacy," Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring), or physically intrudes on the Fourth Amendment's protected areas to

gather information, Collins v. Virginia, 584 U.S. ___, 138 S. Ct. 1663, 1670 (2018)

(citing Florida v. Jardines, 569 U.S. 1, 11 (2013)); United States v. Jones, 565 U.S.

400, 406 (2012) (citations omitted) (collecting cases).

Real property designated as an "open field" carries no Fourth Amendment

protection.  Oliver v. United States, 466 U.S. 170, 176-77, 183-84 (1984); see also

Hester v. United States, 265 U.S. 57, 59 (1924).  Therefore, trespass onto an open

field, even one on private property, does not amount to a Fourth Amendment

search.  See Oliver, 466 U.S. at 183; Jones, 565 U.S. at 420-21 (Alito, J., concurring).

An open field may take the form of "any unoccupied or undeveloped area outside of

the curtilage."  Oliver, 466 U.S. at 180 n.11.  In the instant case, the Terry lot clearly

qualifies as an open field.  It is a large, undeveloped, and wooded piece of land, free

of any homes or structures.  (See Def. Ex. 120).  In other words, Madziarek's

campsite was located on an untouched piece of land, bearing no visible connection

to any home or any signals evincing an interest in privacy.

Madziarek's counterarguments are unavailing.  He contends that, because

the Terry property is "heavily wooded and covered in brush," it cannot be an open

field.  (Doc. 37 at 1).  The Supreme Court, however, has explained that "[a]n open

field need be neither 'open' nor a 'field,'" and "a thickly wooded area nonetheless

may be an open field."  Oliver, 466 U.S. at 180 n.11.  Madziarek also contends that

the open-fields doctrine "can only apply if the government is not trespassing or

violating the rights of bailees of property."  (Doc. 37 at 2; <u>see also</u> Doc. 33 at 10).[3]

This argument has also been rejected by the Supreme Court, which stated over 30

years ago that, "in the case of open fields, the general rights of property protected

by the common law of trespass have little or no relevance to the applicability of the

Fourth Amendment." <u>Oliver</u>, 466 U.S. at 183-84.  The Court recently reaffirmed this

principle, declaring that "[t]he Government's physical intrusion on [an open field]

. . . is of no Fourth Amendment significance."  <u>Jones</u>, 565 U.S. at 411; <u>see also</u> <u>Stone</u>

<u>v. Martin</u>, 720 F. App'x 132, 135 (3d Cir. 2017) (nonprecedential) (similar).  The Terry

property is not constitutionally protected, so no Fourth Amendment search

occurred merely by virtue of law enforcement's entry thereon.

 Our Fourth Amendment analysis does end with finding that the Terry

property constitutes an open field.  We must further analyze the presence of a tent

on the open field and any reasonable expectation of privacy attendant thereto.

Importantly, we note that the front of Madziarek's tent was open, allowing

passersby to view the interior of the tent without entering.  (11/13/20 Tr. 15:25-16:2).

Nonetheless, Madziarek claims a reasonable expectation of privacy in his tent and

the area between his tent and the fire pit, which he argues is protected curtilage.

(Doc. 33 at 16).

 The Third Circuit has not addressed whether one has a reasonable

expectation of privacy in their tent and, separately, whether a tent, like a home, has

---

[3] Madziarek fails to offer any case law or discussion of how his purported status as a bailee affects our Fourth Amendment analysis, and we deem this issue to be waived.  (<u>See</u> Doc. 33 at 7; Doc. 37 at 3).

curtilage.[4]  The Ninth Circuit has held that one can have a reasonable expectation of privacy in their tent.  See United States v. Sandoval, 200 F.3d 659, 660 (9th Cir. 2000) (citing LaDuke v. Nelson, 762 F.2d 1318, 1326 n. 11, 1332 n. 19 (9th Cir. 1985)); United States v. Gooch, 6 F.3d 673, 677 (9th Cir. 1993).  But it has also held that the area surrounding a tent on National Park or National Forest land, in a "dispersed, or undeveloped camping area" and visible from a developed camping area, is not protected curtilage.  See United States v. Basher, 629 F.3d 1161, 1169 (9th Cir. 2011).

Assuming without holding that Madziarek has a privacy interest in his tent and that the area immediately surrounding the tent qualifies as curtilage, the record simply does not support Madziarek's argument that an unlawful search occurred therein.  As a threshold matter, equating Trooper Dojka's initial visit to the campsite to a search implicating the Fourth Amendment is highly debatable. Trooper Dojka's initial stop at Madziarek's campsite lasted only three minutes. During his brief exposure to the campsite area, Trooper Dojka was primarily looking for Madziarek who he expected to find engaged in packing as suggested by Moyer.  (11/13/20 Tr. 11:14-15; id. at 16:11-12 ("I was just over there looking for Kevin."); id. at 62:13-14 ("I was just more concerned about seeing if Kevin was in the area.")).  Trooper Dojka observed only those objects in plain view.  At no point during this initial viewing did Trooper Dojka enter the already open tent, examine

---

[4] The Fourth Amendment's protection extends to a home's curtilage—the area "immediately surrounding and associated with the home," Collins, 138 S. Ct. at 1670 (internal quotation marks omitted) (quoting Jardines, 569 U.S. at 6), and "intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened," California v. Ciraolo, 476 U.S. 207, 213 (1986).

containers, or sift through any campsite items.  In <u>Kyllo v. United States</u>, 533 U.S.

27, 32 (2001), the Supreme Court reaffirmed that warrantless visual surveillance of a

home is "preserved" as a lawful investigative technique.  Although not a perfect

comparison, were we to analogize Madziarek's tent to a home, Trooper Dojka was

merely standing at the doorstep, briefly looking around.  Trooper Dojka's only

activity at the campsite was a nonintrusive visual observation of items in plain view.

We conclude that Trooper Dojka's actions do not constitute a search prompting the

protections of the Fourth Amendment.

Even assuming Trooper Dojka's initial visit constitutes a search, it was

conducted pursuant to the voluntary consent of one of the three permitted campers.

Accordingly, it does not violate the Fourth Amendment or its warrant requirement.

<u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973).  Trooper Dojka credibly

testified that Moyer affirmatively consented to the troopers' presence on the

property: "Based on the circumstances of the shots being fired and just trying to

understand the full circumstances of what took place, I asked Mr. Moyer, can you

take me back to the campsite so we can try to find Kevin and talk to him, and he

agreed to do so."  (11/13/20 Tr. 11:17-21).  Madziarek does not contest this aspect of

Trooper Dojka's testimony, and it is undisputed that Moyer voluntarily agreed to

show him the campsite.  (<u>Id</u>. at 11:17-23).  The record is devoid of any evidence that

Trooper Dojka's presence on the property was compelled or forced in any manner.

When Rebekah Terry, the owners' daughter, arrived on scene to confirm that

Madziarek's group had permission to camp on the property, she did not limit the

troopers access to the property in any way, nor did she place any restrictions on their movement around the area of the campsite. (Id. at 41:11-16).

We reject Madziarek's contention that Moyer's consent was invalid because he did not have authority to give consent. (See Doc. 33 at 10; Doc. 37 at 3). Multiple people can have "common authority" to consent to a search if they have "mutual use of the property" and "generally hav[e] joint access or control for most purposes." United States v. Murray, 821 F.3d 386, 391 (3d Cir. 2016) (quoting United States v. Matlock, 415 U.S. 164, 171 n.7 (1973)). Even an individual lacking common authority may nonetheless have "apparent authority" to consent to a search. Under this theory, police may conduct a search "based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not." Id. at 391-92 (quoting Illinois v. Rodriguez, 497 U.S. 177, 179, 188-89 (1990)).

When Moyer consented to guide Trooper Dojka to the campsite, Trooper Dojka reasonably believed that Moyer had authority to give that consent. Moyer apparently did not sleep at the campsite, but he assured Trooper Dojka that he had been there with Madziarek and A.M. the day prior, and had returned to pick them up from the campsite.[5] (Id. at 10:11-17). He informed Trooper Dojka that "they" had permission to be on the property. (Id. at 10:25). That Madziarek had specific information regarding the source of their permission does not render Moyer

---

[5] When asked about complaints about gunshots being fired on the Terry property, Moyer explained to Trooper Dojka that the group was in fact setting off fireworks. (See 11/23/20 Tr. 10:18-11:3, 68:18-21).

incapable of giving consent. Given Moyer's presence at the scene, his familiarity with the Terry property and the campsite, his exit and association with A.M., his description of his activities on the campsite, and his birdcall signals, Trooper Dojka reasonably believed that Moyer had just as much use or access to the property as Madziarek. It was entirely reasonable for Trooper Dojka to treat Moyer's consent as authoritative.

We also reject Madziarek's theory that the government encroached upon the tent's protected curtilage prior to obtaining the search warrant. As stated previously, we conclude that Trooper Dojka's initial observation of the campsite is not an unlawful search falling within the ambit of the Fourth Amendment. Additionally, we question whether the area outside of the tent was protected curtilage. The tent itself was plainly visible from the Riding Club's roadway; it was only 60 to 75 yards from the road. (See id. at 17:12-18); see also Basher, 629 F.3d at 1169. Adopting the Ninth Circuit's rationale in Basher, it may well be that Madziarek lacks a reasonable expectation of privacy in a campsite visible from the road. See generally United States v. Dunn, 480 U.S. 294, 301 (1987) (setting forth factors to be considered in defining the extent of a home's curtilage).

We need not address this interesting issue, however, because Trooper Dojka testified at the suppression hearing that the fire pit was closer to the tent than the IEDs. (See 11/13/20 Tr. 14:25-15:7). In other words, the IEDs and any other items seized from beyond the fire pit were *outside* the area Madziarek claims is protected curtilage. (See id.; see also Doc. 33 at 16). Trooper Dojka returned to the campsite with Trooper Watkins because it was the last known location of an individual with

12

an active warrant.  On the second trip to the campsite, the troopers investigated the suspected IEDs found beyond Madziarek's self-designated curtilage of the tent. (11/13/20 Tr. 23:21-25:13).  They never entered the tent, and Trooper Dojka was not present when the bomb squad arrived or when the search warrant was executed. (Id. at 23:21-25:13, 27:20-28:4, 63:22-64:7).  Madziarek adduced no facts at the suppression hearing definitively establishing that anyone from the government intruded upon the tent or its supposed curtilage without consent until the warrant was secured.[6]

**IV.**    **Conclusion**

We will deny Madziarek's motion (Doc. 20) to suppress.  An appropriate order shall issue.

Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     March 2, 2021

---

[6] Even if we were to assume the IEDs were located in the area claimed to be protected curtilage, the troopers view of them presents emergency circumstances justifying any alleged encroachment.  See generally United States v. Coles, 437 F.3d 361, 366 (3d Cir. 2006) (citations omitted) ("Examples of exigent circumstances include, but are not limited to . . . danger to the lives of officers or others."); United States v. Haldorson, 941 F.3d 284, 295 (7th Cir. 2019), cert. denied, 140 S. Ct. 1235 (2020) ("The exigent circumstances exception is 'frequently invoked in cases involving explosives.'" (citation omitted)); (see also 11/23/20 Tr. 62:12-16).